Our first case today are numbers 20-1589 and 20-1609, Eileen Gibson v. State Farm. Mr. Salzberg, are you ready? Yes, Your Honor. Thank you. I'd like to address a question to the Court, if I may, before I start my argument. As the Court is aware, there are consolidated appeals here, and State Farm is the appellant on 20-1589. I understand that I have the privilege of arguing first. My question really goes to what order we go from there, whether my partner sitting next to me, who is representing State Farm as the appellee on the cross-appeal, whether she would argue next, or whether there would be argument first from the Gibsons responding to my argument, if you follow. Yeah, so you prevailed. You lost on liability, so to speak, but you prevailed on bad faith, right? Exactly. So in light of that, I'm going to have Hugo hear each issue argued separately, because I think it makes more sense to have Ms. Casasanto open on the bad faith issue, since she's seeking reversal on that one. Do you want to reserve any time for rebuttal on your issue? I do. I want to reserve two minutes, Your Honor. Okay, two minutes. Yes. All righty. You may proceed. Thank you. The issue presented by State Farm's appeal in this case is whether the application for insurance made by Eileen Gibson on April 22, 2016, requesting bodily injury liability limits of $250,000-$500,000 and stacked underinsured motorist limits of $100,000-$300,000 for each of the three vehicles to be insured under the policy constituted a valid request for lower limits of underinsured motorist coverage. And I would like to separate that issue into two subparts for simplicity purposes, and the subpart being the issue of whether an application for insurance can ever constitute a valid written request for lower limits of underinsured motorist coverage under Section 1734 of the Financial Responsibility Law. And that question was presented to the Supreme Court of Pennsylvania in the ORSAG case, and the specific question that the Supreme Court granted review on in that case was… ORSAG answered that yes. I think we know that. Okay. So the tougher question is, here, your application said that the reduction form was, quote, required. So why doesn't that make your case more like Freeth than ORSAG? Okay. Well, Freeth…the facts in Freeth are completely different than the facts here. And in that case, they were dealing not with just an application, what's called a summary form. The application…well, the request for coverage in Freeth was a request for coverage in all 50 states and the District of Columbia, and it had a summary form which set forth the different limits of coverage that were being asked for in each of the 51 different jurisdictions. And in the summary form itself, it said that there are certain states that had an asterisk, which included Pennsylvania, which had their own laws with respect to requesting uninsured and underinsured motorist coverage. And basically, what the insurer was told in that case is that if Pennsylvania has its own set of forms, you have to have those forms, and this summary form will not be sufficient in those states with an asterisk, which included Pennsylvania. And there wasn't a separate form. There wasn't a separate request for lower limits of underinsured motorist coverage in Freeth. And what the insurer was told was if you don't have that separate request, then you'll be given limits required by operation of law. And the default coverage in Pennsylvania is equal limits of underinsured motorist coverage. I'm not sure I appreciate, Mr. Salzberg, why it matters whether the application was for 50 states or one state. Let's assume the facts were the same here, and we're talking about only an application in one state, Pennsylvania, but the exact same form was used as in Freeth. Namely, it said something to the effect that this policy will not be effective unless and until a separate form is signed. Wouldn't you lose under those facts, even if it was just an application in one state? Given the way Freeth was decided, Your Honor, that if our application contained instructions, guidelines, or it said anything to suggest to the insured that your application is not sufficient unless you complete these other forms. If it said that, that the application is insufficient unless you complete the other forms, then we'd have the Freeth situation. But there is nothing in the State Farm application that says that. Excuse me, Mr. Salzberg, but we all know we're dealing with the very familiar concept, looking about ambiguities in the insurance, the insurer-insured relationship. If there is an ambiguity, you understand, at least under much of the case law, that the insurer is something at risk. Do you agree that the application can be part of the analysis of whether an ambiguity exists? Or do you think that the limitation of that principle is only in the policy itself? No, Your Honor, I would say if there is an ambiguity in the application, who is, what the Supreme Court also said in the Orsag case was, and I just want to go back and touch on that. In addition to the fact that an application can be the valid written request under 1734, it was the most effective way to make that request under Section 1734. And then it didn't say that every application always constitutes a valid written request, but it applied the same standard to an application that to any other writing, and that a writing is going to constitute the request under 1734 if it's signed by the insured, and the insurer's intentions are clear that they're asking for certain limits of underinsured voters' coverage and certain limits of bodily injury liability coverage. And here we have it. As between the insured and the insurer, which of the two has the obligation to, in essence, go first? Must it be an inquiry initiated by one as opposed to the other, in your view? Your Honor, I'm not sure I understand the question. Well, 1734 talks about the requirement of a writing. Is it the obligation of the insurer to ask the insured to initiate the inquiry, or is it the insured obligation to initiate the request for the lower limits? I would answer that this way. I think it's the obligation of the insurance company to make sure they have a valid written request for lower limits, and if they don't get the valid written request for lower limits, then they have a problem. By when? By when. What we're arguing in this case is in this case before the accident. The question that we're presenting to this Court is whether this application constitutes a valid written request. The fact that a couple weeks after the accident there was a separate document signed, we're not relying upon that to say that that was the effective request. That just shows, Your Honor, that there was no ambiguity in what they wanted. When asked a couple weeks later, they requested the same amount. Moreover, when they filed a lawsuit two and a half years after the application, they filed a lawsuit relying on the application saying, you're required to provide $300,000 in underinsured motorist coverage. There was no ambiguity as to what the yes were. They may have been legally mistaken about their rights on that, just like your client might have been legally mistaken about the notion that a separate document that was, quote, required, according to your client, had to be signed at some point in time, right? That may have been a mistake of law by both sides, right? Well, I suppose, Your Honor, but we're talking about whether there's an ambiguity. And when they're under OSSAG, it says that if the written request is clear that you're asking for different limits of underinsured motorist coverage and bodily injury liability coverage, I say it's three times in the application. No, but my point was more along the lines of you sort of hit them with their understanding that they had $100,000, $300,000, not $250,000, $750,000. And my point to you is I don't think their understanding necessarily changes the deal, right? Just like if your client had an understanding that the form that was signed after the accident was, quote, required, that doesn't mean that's the law. The law might be that the application purchasing $100,000, $300,000 was sufficient, right, regardless of what your client thought about it afterwards. Yeah, but I'm not just addressing their understanding, Your Honor. What I'm addressing is, is that whether they requested $100,000, $300,000, and it's clear from their actions and their attorney's actions in filing the lawsuit and throughout the course of the trial until post-trial that they understood that they knew that that's the coverage they asked for. Well, perhaps the coverage caused them to revisit their view, though, right? I mean, the jury verdict, so, you know. Nobody said that they didn't ask for $100,000, $300,000 limits in UIM coverage and $250,000 and $500,000. That's never been an issue. That's what they asked for. They say because State Farm had a separate form. The issue in this case, Your Honor, as I see it, is whether the application constitutes what's required under Pennsylvania law. The fact that State Farm may have a separate form and may have a better form, and they use it, and they have a redundancy built into their application process, and the fact that State Farm may have violated its own procedures, that doesn't give rise to a right to reform the policy unless somehow the Gibsons were misled. In Freeth, the insurance company was basically told that if you don't get separate forms for each of the states that have an asterisk, then you have to provide the default coverage, which is the equal coverage. State Farm policy says nothing to that. There's no way it was suggested to the Gibsons that if State Farm didn't get the separate form signed, then they would be entitled to equal limits. All right. Thank you, Mr. Salzberg. We'll hear you on rebuttal. Mr. Altapiedi? You're muted, sir. Is that better? Yes, I can hear you now. Great. Good afternoon. The Gibsons' position is that there is an ambiguity in the initial application. The first time that they became aware that there was any coverage that they could have had for UM and UIM limits was when the signed-down form was done on May 24, 2016, after the crash. This was the first time that that ever became aware to them. This notion that the application was something that they requested is not accurate. The form, the application form, is a State Farm form. What it appears that happened was that State Farm had increased the bodily injury limits for the Gibsons that had been discussed. There was no discussion at that time about anything dealing with increased limits of UM-UIM because they didn't even know about that, again, until after the crash. The problem is that after the crash, they thought that this form… How could they not know about it? I mean, according to the application, they purchased 100 and 300 of UM-UIM, right? I mean, that's right on the form, right? Right, but that's the same coverage. You see, that's the same coverage they had with the injury policy when they walked into the State Farm agent. So we can understand how that actually happened, that they gave them the same coverage. They didn't know at that point, like I said, until there was an actual signed-down form given to them in May. And at that point, she was hurt anyway, that this coverage could have been equal to that. But they thought that this was retroactive to the original application. That's how this thing with the lawsuit came about, where they requested the $300,000, because that's all they got. Didn't they read the form? Didn't they read the form? I'm sorry, which form? The application that they signed. Sure, they did read the form. The application had on it that there was 100 in UM-UIM coverage, that there were liability limits. But what they didn't know was that they had the option at that point of increased limits, that the default was increased limits, equal to the liability limits. That's the failure here. So that sounds like a failure to disclose. What you're saying is that the company didn't explicitly tell your clients that they had the option to have higher underinsured motorist coverage? That's why, exactly. That's why. But how do you square that with ORSAG? Because ORSAG seems to say pretty directly that the insurance policy, the application, is sort of the clearest way to ascertain how much coverage someone is buying. And here, your clients didn't buy, they didn't pay a premium for $750,000 in underinsured. They paid a premium on $300,000 underinsured. Okay. The difference with ORSAG, as you've mentioned, is the facts in that case. So in the ORSAG case, it was determined that the client, that the customer had requested the limits because those limits were written in. This was not a preprinted form. This was a preprinted form in our case that State Farm presented to them. This was not something that the clients requested. This was an evaluation of coverage given by the State Farm agent to the client because they were getting new coverage in place of the ERIE policy. In the ORSAG case, limits of coverage were actually handwritten in. And that was one of the determining factors that the ORSAG court found. Well, that's not what the holding says. The holding says the insurance application in question here satisfies Section 1734's writing requirement as it clearly indicated appellant's desire for reduced UM-UIM coverage and was signed by the insured. Right. But in this case, even State Farm admits that the client didn't know anything about reduced coverage. That's the issue. Because in their brief. Signing it, the insured clearly had the opportunity, even after the accident, to sign and, again, embrace the lower limit. I'm sorry? Yeah, but that is no moment for this collision. In other words, it's not retroactive. They signed it on the 24th. So what? At that point, they knew that there were lower limits. So they signed the form. And they thought that that's what they were supposed to do because that's what the agent presented to them. Well, then you're saying it's not evidence of the insured's intent, but rather a result of some misunderstanding. Well, that could be part of it. But there would have been no misunderstanding had the required document that State Farm had prepared, that they had prepared to comply with Section 1734, was signed at the time of application. Where does the law say that that sign-down form was required? A form is required. What law says that? A form of writing is required. What Pennsylvania statute or case law says that the sign-down form the Gibson signed after the accident was actually required under Pennsylvania law? It doesn't require that that specific form. It requires a writing. Yeah. Okay. And then why isn't we get back to why isn't the application the writing? And in ORSAG, the Supreme Court of Pennsylvania said the application was a writing. Here, there's an application before the accident that says that they purchased 100-300, and presumably they paid a premium on 100-300, not a premium on 250-750, right? Right. But in the ORSAG case also, there was no pre-printed form for the sign-down. And in this case, there was. In other words, this was a whole policy and procedure that State Farm had set up for their agents. They gave them an application. They gave them required forms that needed to be signed at the time. What we're all missing is the fact that, well, why didn't he just get it signed at the time? We wouldn't be here if that happened. Why did they have to go back after the collision on the 24th of May to get it assigned something if, in fact, as they're now arguing, that the application was sufficient? Because they knew it wasn't sufficient. They had prepared a whole package of documents in order to comply with the statute. They have teams of lawyers to do this. That's one of the things that they did here. They prepared a whole package of documents for their agent. So the agent messed this up. Now they come in and they go, oh, well, we don't care about that anymore, that form. The application's sufficient. But what they talk about is they talk about that Ms. Gibson ratified her intention after the collision. Was there any allegation here that the Gibson's agent lied or misled them when they had them sign the check down form after the accident? Absolutely. Lied or misled them as to what the extent of the coverage was for under insurance? Well, not just that, but what they did was they misled them by even getting her to sign that form at that time because they knew this came up after the collision. But I don't see the agent named as a defendant for fraud or misrepresentation or anything like that. Where did you sue the agent for fraud or misrepresentation? We didn't. And that's an issue for another day, I think. But the problem here is that the agent got them to sign this form knowing they were fully aware that this could affect her situation in the pending case collision that she had. I suspect we're going to hear about that on the bad faith side of this argument a bit. But going back to Judge Partiman's reference to where in the law do these things appear, have you given any thought to the difference in the act in sections 1731, the notice requirement there, and the language used by the legislature in 1734? I see a difference in what the legislature has said. Well, there's no doubt there's a difference. How do you reconcile that? Why would the legislature not have written it the same way, do you think? Yeah. Obviously, I can't reconcile what the legislature did. But what we can say is that it's developed through the case law. And we have Freeth and we have Orsag. In a certain situation, which was Orsag, the court found and we came out and said this right at the beginning when we got involved with this, that Orsag was applicable, but not but distinguishable because it's completely different than the facts in our case. Again, State Farm. Applicable but distinguishable. Well, it's a lot distinguishable because in our case, State Farm had a preprinted form to comply with 1734 and in Orsag, they didn't. And that was one of the big distinguishing factors also. So State Farm knew that the form was necessary in this case. Here's the other interesting thing that you mentioned about. You think let me let me just challenge you on that, Mr. Altapiedi. So it's your view that the practices of the various insurance companies change the law. So if Company X just has an application and the insured applies for 100 and 300 and signs it, then that will be enforced. But if Company Y has a separate form, to use Mr. Salzberg's word, redundancy built into the system, then Company Y will be held to a different legal obligation because it requires or offers this additional form beyond the application. Is that your position? I don't think that's our position. I think the position is, and we're missing part of that, that again, there has to be knowledge by the person they're selling insurance to that they can have limits equal to the liability limits at the time of application. That's one of the things that's missing here that would have been taken care of had the required form been presented to them and signed at that time. The whole point is this. Why don't they just get the form at the time of application? Very good question. Very good question. Judge Roth, do you have anything else for Mr. Altapiedi? No, I don't. Okay. Thank you, sir. We'll hear rebuttal on this issue from Mr. Salzberg. Thank you, Your Honor. Could you start where Mr. Altapiedi left off with what I just described as a very good question? I mean, if you have the form and you say it's, quote, required, is it not better to give the form to the insured before the insured has an accident rather than after? Your Honor, the best practice is to give the insured the form at the time of application. There's no question about that. I think that's what State Farm anticipates that the agent's going to do. But it doesn't work that way in every case. Sometimes the insured is pressed for time. They sign one document. They leave. Maybe it's sloppy practice by the agent in this case. All right. So the agent screwed up here. Then the question becomes, what does that mean legally? And I guess your position is, well, the agent screwed up at least as far as not following State Farm's best business practices. But you're saying it's of no legal moment because the form is surplussage. It's just what you call redundancy or surplussage. Is that your position? Well, it's more than that, Justice Duran. Your Honor, we've litigated this issue about whether an application can be the request for lower limits for years and years and years. When I was preparing for this argument, I remembered a case I had. And it's Young v. State Farm back in 2002 that was an appeal to this court. And it was an unpublished opinion that's reported at 54 Fed Appendix 365, 2002. And I'm not citing that for the holding in the case. But we've recognized this as an issue all along. And particularly before ORSAG, we were using this form because there was an unknown as to what the courts were doing. If you read the ORSAG opinion, the state of the law was muddled, according to the Supreme Court. And they clarified it in ORSAG and said this. But we carried on the practice even after that because the plaintiff's bar is very imaginative. They don't give up. And in the next case, in this case, yeah, we'd be better off if we had both forms signed. There's no question about that. But Your Honor, I think, understands the argument that, OK, the agent violated state farm procedure, which was not required by statute. And the application is sufficient under the statute. And I just want to clarify that the prior carrier of the business here was not ERIE. It was actually GEICO. And the application says that they had insurance with GEICO for eight years. And it's documented in this case that their limits with GEICO for both for vital entry liability limits were 100, 300. And for UM, UI limits, UM and UIM was also 100, 300. They knew that they could purchase equal limits. They had done it before. And if you look at the application here, Your Honor, it's not something that's the state farm pre-prepared. There are three vehicles that are to be insured under this policy. And some of the coverages that they elected are consistent with GEICO. Some of the coverages that under state farm policy are more than GEICO. But more importantly, the third vehicle, the first two vehicles, one and two, they purchased property damage coverage for, OK, collision and comprehensive. And they took the lowest deductible, $100. And for the third vehicle, which was a 2000 Volvo, they apparently decided after discussion with the agent, it wasn't worth paying the property damage coverage for that vehicle because it wasn't worth that much. So that application they signed, even for the three vehicles, didn't have all the same coverage for the three vehicles. And it indicates that there was a discussion with the agent before this application was prepared. And what the agent, I suggest them to do is to give them the coverages that they wanted. And they wanted here $250, $500 in liability and $100, $300 in UM and UIM. Is there any evidence in the record to tell us with certainty that they only paid a premium for $100, $300 rather than paying a premium for up to $750? No, Your Honor, other than because this issue wasn't raised until post-trial. I mean, there was no discovery taken on this issue because everybody agreed that the limits were $100, $300. It was after the verdict and the post-trial motion where we filed a motion to remit the verdict to the $300. And they say, well, it should be $750. That's the first time the issue was raised. So there's nothing there other than I can assure you. And I think the common sense tells us the higher limits you purchase, the higher the premium is. Well, there wasn't that much time, was there, between the institution of this policy and the accident. It was a very short amount of time. It was a couple of weeks, Your Honor. But there really wasn't any kind of a record that even would have been available as to the amount of the premium. Yeah, well, but the policies are issued for a six-month period. If you wanted to, you could go back and say, what was the policy premium for $100, $300, and what would it have been for $250, $500? I can't answer that question, but I guarantee you it would have been higher. Could I ask a question about the case law? Do you find any role, not only for the cases we've been talking about, but the Third Circuit case in Farmland versus Sechrist? Are you familiar with that case? I'm very familiar with the case, Your Honor, where they had an application. They had the form, but the limits on the form were obscured. And they found that there was a valid request for lower limits. Does that case have a role to play in this one? Well, it shows that when the facts are a little different like they are in that case, they're going to have a decision that's different than the Freed case. But I have to say, as an officer of the court, the court also mentioned in that case that they were given, I think, the Section 1791 important notice with the application. And the 1791 important notice gives you all the coverage that are available for purchase. So they could attempt to distinguish that case on that basis. But as I say, I argued a case in front of the Supreme Court a couple of months ago, and I got into it a little bit with Justice Behr. And Justice Behr, one of the few things we agreed on was, is that an insurer should be given the coverage that they paid for. And the coverage that they paid for here, that they requested, that they were charged for, that they paid for, were limited to 100 and 300 stacked. So they paid for stacked $300,000 limits. That's the coverage that they should have. Well, I'm going back to the role that I started, where I started a few moments ago. And that is, is there an ambiguity? And if so, where does it arise from? Has it been resolved? And how does it get resolved? And I think the Sechrist case declined to find an ambiguity, if I recall correctly. Correct. And the court has asked me to distinguish Freeth from Worsag in this case. And again, I say, if there was anything in that State Farm application that told the Gibsons that if they didn't sign this separate document, that they would be provided with the coverage required by operation of law, State Farm would have a problem. But there's nothing in the application that suggested that. Nothing whatsoever. If we look at it as a whole, which, since I'm sure you've done your homework, you know, is a familiar concept in the appellate world of evaluating insurance disputes. Looking at the whole thing, do you not find an ambiguity? No, I absolutely don't find an ambiguity. Your Honor, if the facts were changed, and if when this form was presented, and there's nothing in the record that suggests that they had this form signed because of this accident, is that somebody said, okay, we didn't get all the forms, get the forms. I see this in plenty of cases that months may go by, there's no accident, and forms are signed later because you ought to comply with what the State Farm's procedures are. The fact that, but if in fact, if in fact that a couple of weeks after the accident, when they went out and said, is this a car, with additional forms assigned, if the Gibsons had said at that point, wait a second, we don't want, we want more underinsured motorist coverage. And then you might say, well, we didn't understand the application. That's not what we asked for. Maybe there would be an ambiguity there. Maybe. But that didn't happen. As I go back to what I said in the beginning, everybody, State Farm, everybody understood that, look at the application. The application is the request for lower limits times three. It's for vehicle one for the limits, vehicle two for the limits, vehicle three for the limits. It was signed by Ms. Gibson. It falls squarely into what the Orsay court said. You have a request for lower limits that's signed by the insured, and it's clear that what they're asking for, and that's the, that satisfies section 1734, whether it's an application for insurance or whether it's a separate document. Doesn't matter. All right. Thank you very much, Mr. Salzberg. We'll hear the appeal of the Gibsons on the bad faith issue. Ms. Casasanto. Thank you. Excuse me. Reconsideration of the dismissal of the Gibsons bad faith action is warranted. Did you want to reserve any time for rebuttal, Ms. Casasanto? I don't believe that's needed. No. Okay. Thank you. Reconsideration is warranted here based upon new evidence that has come to light and also to prevent a manifest injustice to the Gibsons. The new evidence is the realization that there was a clear intent by State Farm to hide the actual UIM limits from the Gibsons. Trial counsel, Mr. Fioravanti, acknowledged that he mistakenly accepted the declaration sheet and also the representations by State Farm and their counsel as to what the UIM limits were. However, when addressed. When did he first express that recognition? It was after the verdict. Right, right. So it was all about the verdict when he realized, you know, this is a back-up-the-truck verdict, right? It's a great verdict. And then maybe he reconsidered his evaluation of the case, right? What happened was when he was addressing the molding issue, he consulted with other counsel in our office here, and it was then discovered what actually happened. The conduct of. But how do you get around what the court said in Cowden? And I'm going to quote the court said a large jury verdict, quote, does not of itself lend substance to the charge of bad faith. It is merely proof that the results of Saturday's contest are more certainly stated on the following Monday than they are predictable on the preceding Friday. Don't we have to follow that? Well, the basis for our appeal is not the size of the verdict. It was what was discovered and how the conduct of State Farm and what they did. So the verdict isn't part of the new evidence? I thought you said the verdict was the new evidence. No, that's what I believe the lower court thought. What's the new evidence? The new evidence was this realization of what happened and what State Farm did. But your predecessor counsel knew that the sign down form was proffered a couple of weeks after the accident. Your predecessor counsel knew that way before trial. Well, he he he knew it based upon a footnote that was hidden in a rule 26 discovery plan. And that was a footnote that was only inserted there to cover their agent's mistake and to limit their exposure. The evidence is not actually new evidence. It's just the significance of pre-existing evidence may have struck counsel after the at that point. It's not technically new evidence. It's just a new realization that something was missed. Right. And then how does that how is that new evidence? Well, it's new evidence because it just came to light afterwards. And did it come to light only because was it was it not in the light? Was it in the dark because of something that the insurer did? Or was it just always there and not noticed? It was the fact that trial counsel predecessor counsel believed State Farm and believed their attorneys and what they what they represented to them. And the in addition, the new evidence is also the district court's molding of the verdict in the in the limits of seven hundred and fifty thousand dollars. So is this a misrepresentation case for a bad faith case? This is bad faith for misrepresenting the coverage limits, which the court the courts have determined can amount to bad faith. State Farm had an obligation to act in good faith and utmost fair dealing. They didn't do that when they have attempted or when they obtained Mrs. Gibson's signature after the collision, when they knew at that point she had been involved in an accident. She had broken bones, was injured, and they went to went to her, obtained this signature on their their own form. And the only reason that was done was to limit their exposure. And this was done in violation of their their duty to act in good faith through their insured. They should have at that point advised her to seek counsel because she she had they they were aware at that point that she had there was a potential for a claim. What if it was done to what if it was done to confirm the coverage amounts rather than to change them? Well, as you said, limit their exposure. What if they were just they were just confirming what they understood the coverage to be, namely one hundred three hundred? Well, but the problem there is, is that the limits weren't one hundred three hundred because of all of the issues that were argued on the other on our coverage issue based upon the fact that at the time of the initial application required documents were not signed at the same time. They attempted to correct their agent's mistake by going to her or obtaining a signature from her after an accident, after they know she's injured. And that just wasn't what they you know, that's amounts to bad faith in addition to the misrepresentation all along in the from the initiation from the inception of the claim all through that the coverages were three hundred thousand. So based upon the conduct of State Farm, the initial claim was that they failed to properly evaluate the UIM claim that coupled with this conduct that came to light after the verdict warrants a reconsideration and warrants the ability of the Gibsons to present their bad faith claim. Also, it's important that to note that State Farm, when they filed their motion for summary judgment, asked that the summary judgment on bad faith be granted with prejudice. But the lower court didn't do that. They dismissed the bad faith claim, but did not dismiss it with prejudice. And we're here now trying to have the Gibsons enable them to present that claim going forward. Thank you. We can't hear you. Yeah, I apologize. Thank you. Sorry. I had it on you. We'll appreciate your argument. We'll hear from Miss Douglas. Please support. We're here today to look at Judge Rice's February 18, 2020 decision not to grant reconsideration to the Gibsons on their attempt to resurrect their bad faith claim. Judge Rice's decision is to be reviewed under an abuse of discretion standard. That's the standard to use with a motion for reconsideration. And when you look at what Judge Rice did, he didn't abuse his discretion, and this court should affirm the decision that he made. When you use Max's seafood, what you're looking at, the case tells you to look at, was there a manifest error of law? Has there been a new change in the law, or is there some new evidence that would, if it had been known to Judge Rice, have changed everything? So when you look at the legal side of things, Judge Rice applied longstanding Pennsylvania law on bad faith. That law hasn't changed, and he did not create a manifest error of law when he applied that law. The motion for summary judgment done back in July of 2019 focused on the arguments the Gibsons were making at the time in terms of State Farm's bad faith. They said the State Farm committed bad faith because before suit was filed, it didn't get a statement under oath, and it didn't get an IME, independent medical examination. And if it had done those things, it would have made a higher offer than what it made. That's what State Farm was accused of. State Farm then filed a motion and put the whole record in front of Judge Rice, and he looked at the record and decided that no reasonable jury, seeing those facts, could find that State Farm's behavior was unreasonable, so summary judgment was granted. What you won't find in the motion for summary judgment is any reference to any type of coverage issue, any I was misled, I was lied to, someone hid this from me. That's not in the motion for summary judgment. It was not considered by Judge Rice. After the verdict, the Gibsons now say that's new evidence of bad faith. But, Your Honors, go back and look at the initial complaint that the Gibsons filed when they started this lawsuit. Exhibit P to the plaintiff's complaint is the very application that you heard Mr. Salzberg and Mr. Altapedie argue about. That document has been available to the Gibsons from the get-go. Then you come to the joint discovery plan in February of 2019, and it was not hidden. It was not some buried footnote. Counsel for State Farm emailed counsel for the Gibsons about the joint discovery plan, and one of the first things you have to tell the court is, what is the coverage? So it was drafted, and a footnote was put in there laying all the cards on the table. Application April 22, 2016. Accident May 5, 2016. Signature on the request for lower underinsured motorist coverage May 24, 2016. It was all out there. It wasn't hidden. There was no lie. There was no misrepresentation. If counsel for the Gibsons did not agree with State Farm's position that ORSAG says the application alone is enough and is sufficient, it could have been litigated. There could have been written discovery on it. There could have been oral discovery on it. It could have been addressed in the motion for summary judgment, but that didn't happen. When the Gibsons made their request to bring the bad faith case back, Judge Rice looked at everything, and Judge Rice concluded that all of the available coverage documents were available to the Gibsons at all times. There was no surprise. There was no unfair behavior. And as a result, it was not new evidence which could justify reconsidering his July 2019 decision to dismiss the bad faith claim. One of the ironies here, Ms. Douglas, is that undoubtedly the fact that he found $750,000 instead of $300,000 in underinsured coverage, that would make it less likely that he would hit you with bad faith, right? If, in fact, they were entitled to higher underinsured motorist coverage, then they got what they bargained for. But if the trial judge knew, if it were the other way, and the trial judge knew that they had been duped into getting only $300,000 in underinsured coverage when they wanted more, that might have made it more likely that a bad faith finding was made, wouldn't it? Well, Your Honor, this would be a very different case. This would be a very different case if when the joint discovery plan was drafted and State Farm said, it's our understanding that the coverage is $300,000. If the Gibsons had said, no, no, no, no, no, no, you're wrong. This isn't ORSG. This is free. Then we could have done written discovery. We could have done oral discovery. There could have been a whole analysis of what was going on. And when the motion for summary judgment was filed, that would have been before Judge Rice. This whole concept of did someone lie? Did someone cheat? Did someone steal? Is someone trying to abuse the Gibsons? That could have been something that was considered. But that didn't happen because, Your Honor, it just didn't happen. The application was signed on April 22, 2016. Just as Mr. Salzberg said, it was a specific written request by the insured for lower limits. State Farm understood it to be $300,000 in coverage, and the Gibsons understood it from the time the suit was filed. That's what the complaint alleged. There was a motion in limine filed by State Farm where State Farm said the jury shouldn't be told the amount of the coverage. The jury should decide this case based upon the injuries and what is the case worth. So we filed a motion in limine saying it should be $300,000. And the Gibsons counsel opposed us and said, no, no, no, no, no. This is a breach of contract case. The Gibsons bought $300,000 in coverage. They should be allowed to tell the jury that. And then ultimately, Judge Rice decided, no, the best way to try the case is for the jury to have no information on the amount of coverage and just decide on the injuries. I don't think anyone, I would say even the Gibsons, imagined that the jury would award $1.75 million given the injuries as they were known to be. Part of your question was, would State Farm have evaluated this case differently, whether there's $300,000 of coverage and $750,000 coverage? The answer is no. State Farm evaluated the case based upon the injuries. And so based upon the injuries, State Farm didn't believe the case was worth $300,000. Well, jury proves you're wrong on that one. Yes, you're right. It's exactly what they say in Cowden. You don't know what's going to happen on Saturday until after Saturday's happened. All right. Judge Roth, do you have any additional questions for Ms. Douglas? No, I don't. Judge Prater? No. Okay. We thank you, Ms. Douglas. We thank all counsel for the very helpful argument. We'll take the matter under advisement. Thank you.